# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD BROWN and CAROL BROWN,** | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1224 |
| | ) | |
| **BRIAN CUSCINO,** | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge

## I.      Introduction

Pending before the court is a motion for summary judgment (the "Motion") (ECF No. 39) filed by defendant Brian Cuscino ("defendant" or "Cuscino") seeking judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 against Edward Brown ("Mr. Brown") and Carol Brown ("Mrs. Brown," and together with Mr. Brown, "plaintiffs'), with respect to all claims asserted in plaintiffs' amended complaint (the "Amended Complaint"). (ECF No. 14.) Defendant also asserts that plaintiff's claims are barred by qualified immunity. Plaintiffs dispute these assertions.

In the Amended Complaint, Mr. Brown alleges that Cuscino violated his civil rights and asserts federal and state claims: 1) federal claims pursuant to 42 U.S.C. § 1983 for unlawful arrest and use of excessive force in violation of Mr. Brown's rights under the Fourth Amendment to the Constitution of the United States (count VI), and 2) state claims under Pennsylvania law for assault and battery (count VII). Mrs. Brown asserts a state claim against Cuscino for loss of

consortium.  (Am. Compl., ECF No. 14.)  Jurisdiction over Mr. Brown's federal question claims

is predicated upon 28 U.S.C. § 1331 and 42 U.S.C. § 1983.  Supplemental jurisdiction over Mr.

and Mrs. Brown's state law claims are predicated upon 28 U.S.C. § 1367.

For the reasons that follow, the court will grant Cuscino's Motion with respect to all

federal question claims because there is no issue of material fact in dispute and Cuscino is

entitled to judgment as a matter of law.  Since Mr. Brown's federal law claims will be dismissed

and because the remaining claims arise under Pennsylvania law, the court will decline to exercise

supplemental jurisdiction over those claims.  28 U.S.C. § 1367(c)(3).

## II.    Background

### A.    Procedural

On September 4, 2008, plaintiffs commenced a multiple-count lawsuit against several

defendants.[1]  (ECF No. 1.)  On December 1, 2008, plaintiffs filed the Amended Complaint.

(ECF No. 14.)[2]  On December 5, 2008, defendants Cuscino, the City of New Castle and The

New Castle Police Department ("NCPD") filed a partial motion to dismiss.  (ECF No. 15.)  On

April 3, 2009, this court dismissed without prejudice plaintiffs' claims against the City of New

---

[1] The amended complaint originally named as defendants Darrin Paul Cwynar ("Cwynar"), Shenango Township Police Department, Shenango Township, the New Castle Police Department, and the City of New Castle.  These defendants were dismissed from the case.  See minute entry, Apr. 3, 2009; Stipulation of Dismissal (ECF No. 38.)

[2] Dismissed claims set forth in the amended complaint included : 1) count I: §1983 claims by Mr. Brown against Cwynar for unlawful arrest and excessive force; 2) count II: claims by Mr. Brown against Cwynar for assault and battery; 3) count III: claims by Mrs. Brown against Cwynar for loss of consortium; 4) count IV: claims by Mr. Brown against Shenango Township for negligent and wrongful assault and invasion of privacy; 5) count V: claims by Mr. Brown against Shenango Township Police Department for negligent and wrongful assault and invasion of privacy; 6) count IX: claims by Mr. Brown against the City of New Castle for negligent and wrongful assault and invasion of privacy (equal protection and First Amendment claims); and 7) count X: claims by Mr. Brown against New Castle Police Department for negligent and wrongful assault and invasion of privacy (equal protection and First Amendment claims).

Castle and the NCPD. On that same day, plaintiff stipulated to the same disposition with respect to claims against defendants Shenango Township, Shenango Township Police Department ("STPD"), and Cwynar. (See minute entry, Apr. 3, 2009, ECF No. 38.) On May 10, 2010 Cuscino filed the instant Motion. On June 21, 2010, plaintiffs filed a response. (ECF No. 42.) On July 24, 2010, defendant filed the parties' combined statement of facts (the "Combined Statement of Facts" or "Def.' SF" together with "Pls.' S.F") (ECF No. 66.)[3] The matter is ripe for disposition.

### B.    Factual

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [their] favor."). Because plaintiffs are the nonmoving parties against whom summary judgment will be evaluated, the background is viewed in the light most favorable to them. See Doe v. Cnty. of Centre., Pa., 242 F.3d 437, 446 (3d Cir. 2001).

On January 24, 2007, Mr. Brown, who was seventy-three years of age at the time, drove to the Lawrence Village Plaza, in Shenango Township, Pennsylvania near the city of New Castle Pennsylvania, for an 11:30 a.m. appointment to have his eyes examined and to purchase prescription eyeglasses at the Pearle Vision ("Pearle") eyewear store. (Def.'s SF ¶ 1, ECF No.

---

[3]  The Combined Statement of Facts  (ECF No. 66) is comprised of: 1) defendant's facts and plaintiffs' responses thereto set forth initially in consecutively numbered paragraphs, one through forty-eight (Defendant's Statement of Facts ("Def.'s SF"); followed by 2) plaintiffs' facts and defendant's responses thereto set forth in consecutively numbered paragraphs, one through twenty-six (Plaintiffs' Statement of Facts ("Pls.' SF").

66.)[4]  Rebecca Morford, O.D. ("Dr. Morford"), an optometrist at Pearle, performed an eye exam

on Mr. Brown which included dilating his eyes.  (Id. ¶ 2.)   Dr. Morford told Mr. Brown that she

needed to see him again in approximately twenty minutes after his eyes had fully dilated.  (Id.)

While Mr. Brown was waiting for his eyes to dilate, Pearle's receptionist, Erin Cline ("Cline"),

told him that Pearle customarily collects a patient's copay at that time and that his copay was

twenty-five dollars.  (Id. ¶ 3.)  Mr. Brown argued that his copay was ten dollars, at which time

Cline showed him that his insurance card indicated that his copay was twenty-five dollars.  (Id.)

Mr. Brown told Cline that he would not pay until his exam was completed.  Cline agreed, but

informed Mr. Brown that she could not release his prescription until his copay was paid.  Mr.

Brown went to the other side of the store to look at eyeglasses.  (Id.)

After Dr. Morford completed Mr. Brown's eye exam, Mr. Brown asked Cline to give him

his prescription.  (Id. ¶ 4.)  Cline reminded Mr. Brown that she could not do so until he paid his

copay and Dr. Morford stepped in to confirm Pearle's copay policy.  (Id.)  Pearle's office

manager, Barb Wojtowiz ("Wojtowiz"), explained to Mr. Brown that his insurance mandates that

he pay his copay at the time services are provided and that he should contact his insurance with

any questions.  (Id. ¶ 5.)  Mr. Brown told Wojtowiz that he does not "talk to insurance

companies" and that Pearle's employees "were making [him] mad."  (Id.)  Cline testified that

Mr. Brown loudly stated, "I just want my prescription so I can get a price on glasses."  (Id. ¶¶ 5,

6.)

---

[4] In plaintiffs' responses to Defendant's Statement of Facts (ECF No. 66), plaintiff denied most of the facts defendant
set forth therein, on the bases that the facts were: 1) not legally essential for the court to rule on the Motion; and  2)
immaterial with respect to the Motion as a matter of law.  The court will include those facts which provide appropriate
background information that are supported by the record, and were not factually disputed by Mr. Brown.  The salient
facts relate to the actions of Cuscino and what he knew.

Wojtowiz told Mr. Brown that she would show his prescription to the optician salesperson Linda Robinson ("Robinson"), so that he could get a price for glasses, to which Mr. Brown responded, "[t]hat's all I wanted, I have to threaten you people to get what I want." (<u>Id.</u> ¶¶ 6, 7.) After Robinson introduced herself to Mr. Brown, he shouted, "[w]hat are my glasses going to cost," and became upset when Robinson did not immediately tell him what his glasses would cost without his insurance. (<u>Id.</u> ¶¶ 7, 8.) Robinson told Mr. Brown that he could go elsewhere to get other prices if he wished. She felt threatened when he leaned forward and shouted back, "[h]ow would you like it if I spit in your face?" (<u>Id.</u> ¶¶ 9, 10, 11.) Robinson, Wojtowiz, and Cline each stated that staff and customers in the store became upset by Mr. Brown's conduct. Wojtowiz called 911 and reported a disruptive customer in the store. (<u>Id.</u> ¶ 12.)

Another customer in the store, Donna Wacht ("Wacht"), stated that after Mr. Brown paid his copay and received his prescription, she told him that she did not like hearing him speak, and Mr. Brown responded that he did not like her either. (<u>Id.</u> ¶ 13.) Robinson and Cline each testified that plaintiff walked toward the door and paced back and forth for a couple of minutes, "[g]laring at everyone," before he turned around and walked out of the store. (<u>Id.</u> ¶ 14.) According to Robinson, everyone in the store was "frightened [because] [w]e weren't sure what he was going to say or . . . do." (<u>Id.</u>)

In response to the 911 call, the Lawrence Emergency Operations Center ("LEOC") dispatched police officer Darrin Cwynar ("Cwynar") of the STPD to the Lawrence Village Plaza to investigate the complaint. (<u>Id.</u> ¶ 15.) Cwynar was on patrol nearby in his police cruiser. (<u>Id.</u>) Cwynar was informed that a male customer at Pearle was "causing a disturbance and threatening customers." When Cwynar approached Pearl, employees inside the store pointed to Mr. Brown

through the glass door, indicating he was the subject of the 911 call.  (Id. ¶¶ 15, 16.)  Cwynar observed that the individuals inside Pearle were "visibly shaken" and when asked what was going on, Robinson pointed to Mr. Brown and said, "[t]hat's him, that's him," and that "he was irate causing a disturbance and he threatened the employees and threatened to spit in [her] face." (Id. ¶¶ 17, 18.)

Cwynar requested to speak to Mr. Brown three times before Mr. Brown responded that he had just been inside the Pearle store.  (Id. ¶¶ 19, 20.)  Cwynar identified himself, told Mr. Brown that he had been called for a disturbance at Pearle, and asked Mr. Brown to tell him what happened.  Mr. Brown responded, "[w]ould you buy a car without knowing the price of it?"  (Id. ¶ 21.)  Cwynar said that he would not and advised Mr. Brown that he needed to tell him what had occurred in the Pearle store.  Mr. Brown turned around, walked toward his car and opened the front driver's side door.  (Id. ¶ 22.)  Cwynar followed Mr. Brown and advised him that he needed to speak to him and that Mr. Brown was not free to leave.  Mr. Brown responded, "I don't have to do what you say, I don't have to talk to you."  (Id. ¶ 23.)  Cwynar stood inside the open driver's side door while Mr. Brown was seated in the driver's seat.  He asked Mr. Brown for identification and Mr. Brown replied in an "elevated" volume, "I don't have to show you anything and I am leaving."  (Id. ¶¶ 24-26.)  Cwynar testified that he repeatedly told Mr. Brown to give him the keys, he was part of an investigation, and he was not free to leave.  (Id. ¶ 26.)

When asked by Mr. Brown's counsel why Cwynar did not just let him go, Cwynar testified:

> MR. BROWN'S COUNSEL:  Why didn't you just let him go?
>
> CWYNAR:    Because I felt Mr. Brown may be in danger to other people at that point.  I did not know if he may come back to Pearle, he may get involved in a road rage incident.  I didn't

know.  I knew that he was visibly and uncontrollably upset at the time and I did not think that it would be safe for him to leave.

. . .

MR. BROWN'S COUNSEL:  What does that mean to you when you have someone that doesn't cooperate at that point?

CWYNAR:  That I can't let him go because I don't know how much more or what else may happen.  He is unpredictable to me, and that's exactly what I thought at that point, that this guy is unpredictable, I don't feel safe letting him go.

(Id. ¶ 27; Dep. Cwynar, Sept. 29, 2009 at 73, 110-11.)

Cwynar testified that: 1) when Mr. Brown reached for the gear shift, Cwynar grabbed Mr. Brown's left shoulder and "attempted to pull him toward me because I believed that he was going to put the car in gear and I was going to be struck by it;"  2) he warned Mr. Brown that he would tase him if Mr. Brown did not exit the vehicle; 3) he called for backup when Mr. Brown insisted that he would not get out of the vehicle; and 4) he pushed Mr. Brown across the bench seat of the vehicle and got into the vehicle to avoid being run over when Mr. Brown placed his hand on the gear shift for the second time, which caused Cwynar to believe that Mr. Brown was going to back up the vehicle while Cwynar was standing inside the door of the vehicle. (Id. ¶¶ 28-30.)  Cwynar testified that he was on top of Mr. Brown inside the vehicle and continued to command Mr. Brown to give him the keys, get out of the car, and stop resisting.  Mr. Brown responded, "I don't have to do anything you say, get off of me, I am not going to listen to you." (Id. ¶ 31.)

Cwynar testified that: 1) he instructed Mr. Brown he would be tased if Mr. Brown did not give Cwynar the keys and get out of the vehicle; 2) he removed his taser from his holster and

placed it on Mr. Brown's left arm and again warned Mr. Brown that he would be tased if he did not comply; 3) he attempted to reach for the keys and Mr. Brown continued to resist by raising his leg and attempting to throw Cwynar off of him; 4) he warned Mr. Brown again that he would be tased if he did not give Cwynar the keys; and 5) when Mr. Brown did not comply, he applied a drive stun with the taser to Mr. Brown's left tricep. (<u>Id.</u> ¶ 32.)

Cwynar testified that after the taser cycled, he instructed Mr. Brown again to drop the keys and to stop resisting. Mr. Brown responded, "[y]ou think you're a tough guy," and he was not going to do what Cwynar told him. (<u>Id.</u> ¶ 33.) According to Cwynar, when he attempted to reach for the keys again, Mr. Brown moved his knee as though he was going to strike Cwynar in the groin area. Cwynar warned Mr. Brown that he would be tased again unless he stopped resisting and complied with Cwynar's commands. (<u>Id.</u>) Cwynar decided to remain on top of Mr. Brown to keep him contained until backup arrived because Mr. Brown continued to resist by attempting to kick Cwynar even after he applied the drive stun to Mr. Brown's tricep a second time. (<u>Id.</u> ¶ 34.)

Trooper William Phillips ("Phillips") of the Pennsylvania State Police was the first officer to arrive on scene in response to Cwynar's request for backup. (<u>Id.</u> ¶ 35.) When Phillips arrived, he witnessed Mr. Brown "[t]hrashing about in the car" with "his arms . . . flying around and his legs . . .kicking" "[o]ut of control violent" and not responding to Cwynar's commands. Cwynar "had [Mr. Brown] pinned across the front seat of the vehicle trying to subdue him." (<u>Id.</u>) Phillips scanned the crowd of a few people to assure that nothing else was about to happen. (Pl.'s SF ¶ 11, ECF No. 66.) Phillips attempted to get the keys from Mr. Brown because he was concerned Mr. Brown might accidently strike Cwynar with them or use his keys as a weapon by

holding them in a closed fist with several keys sticking out between his fingers. (Pl.'s SF ¶ 11, Def.'s SF ¶ 36, ECF No. 66.) Phillips grabbed Mr. Brown's wrist. When Mr. Brown refused to given him the keys, Phillips attempted to pull Mr. Brown out of the car at the same time Cwnyar attempted to push Mr. Brown - who continued to resist - out of the vehicle from the driver's side. (Def.'s SF ¶¶ 37, 38, ECF No. 66.)

The next officer to respond was Cuscino, a police officer with the NCPD. Cuscino was aware of Cwynar's request for backup assistance to respond to a disturbance outside the Pearle store. (Pl.'s SF ¶ 1; Def.'s SF ¶¶ 1, 39, ECF No. 66.) While en route, after Cuscino was authorized to respond to the request, he heard a second call from LEOC indicating that an officer was fighting with someone. (Def.'s SF ¶ 39, ECF No. 66.) When Cuscino arrived on the scene he noticed that it was very noisy and that Cwynar and Phillips were on opposite sides of a gold colored car. (Pl.'s SF ¶¶ 3, 5, ECF No. 66.) Cuscino saw Mr. Brown "refusing to let [the] officers handcuff him, . . . refusing to get out of the car.. . . [and] kick[ing] Officer Cwynar." (Def.'s SF ¶ 39, ECF No. 66.) Cuscino testified as he approached the passenger side door, Phillips informed him that "they had a problem in the Pearle Vision Center and Officer Cwynar tried to arrest [Mr. Brown] and he resisted," and Cwynar confirmed that information. (Id. ¶ 41.)

Around the same time, another officer of the NCPD, Shawn Lough ("Lough"), arrived on the scene and observed Cwynar and Phillips struggling with Mr. Brown. (Id. ¶ 40.) Lough approached the driver's side door and pulled Mr. Brown out of the vehicle. He advised Mr. Brown to put his hands behind his back so that he could handcuff him. (Id. ¶ 42.) Lough testified he was trying to get control of Mr. Brown's arms, but Mr. Brown "was still fighting, struggling" and would not "let[] me get his arms." (Id. )

At some point, two other sheriff's deputies arrived on the scene. (Id. ¶ 40.) According to Lough and Cwynar, other officers came to assist Lough and when Mr. Brown continued to struggle with them, they knocked his feet out from under him and took Mr. Brown to the ground.[5] (Id. ¶ 42.) While on the ground,[6] face down with both hands underneath him, Mr. Brown continued to resist and would not release his hands despite multiple commands. (Pl.'s SF ¶¶ 6, 16; Def.'s SF ¶ 43, ECF No. 66.) Cwynar and Lough each attempted to reach under Mr. Brown to grab his arms, but were unsuccessful due to Mr. Brown resistance by pulling away to avoid being handcuffed. (Pl.'s SF ¶ 19; Def.'s SF ¶ 43, ECF No. 66.) Cwynar did not disengage his taser from the holster of his duty belt to use at the time he was struggling to handcuff Mr. Brown. (Pl.'s SF ¶ 7, ECF No. 66.)

Cuscino testified that anytime a person resists arrest he feels threatened and that because Mr. Brown "was still fighting us," he warned Mr. Brown several times that if he did not release his hands, he would be tased. (Pl.'s SF ¶¶ 4, 17, Def.'s SF ¶ 44, ECF No. 66.) When Mr. Brown did not comply, Cuscino applied a drive stun to Mr. Brown's left upper back at which point Mr. Brown released his hands which were placed in handcuffs. (Def.'s SF ¶ 45, Pl.'s SF ¶¶ 18, 22, ECF No. 66.) Cwynar testified that "[c]uffing under power" while the subject is receiving a tase, is the "most opportune time to get them under control," and that when Cuscino tased Mr. Brown, he and Lough were able to subdue Mr. Brown.[7] (Def.'s SF ¶ 45, Pl.'s SF ¶ 20, ECF No. 66.)

---

[5] Cuscino did not see Mr. Brown being removed from the vehicle or which officer forced him to the ground. (Pl.'s SF ¶¶ 9, 15, Def.'s SF ¶ 43, ECF No. 66.)

[6] The ground was wet due to melting snow.

[7] Mr. Brown admitted that "cuffing under power" can be the most opportune time to get a subject under control, but specifically denied that an appropriate situation existed with respect to the matter at issue; instead, use of the taser at that time amounted to use of excessive force. (Def.'s SF ¶ 45, ECF No. 66.)

Lough testified that he heard Cuscino advising Mr. Brown that he would be tased –

although he did not remember Cuscino's exact words – and that he considered Mr. Brown

dangerous because nobody knew what he was going to do.  (Def.'s SF ¶ 43, ECF No. 66.)

Lough stated that Mr. Brown continued to struggle after he was cuffed, and was lifted by two

officers, one on each arm.  (Pl.'s SF ¶ 10; Def.'s SF ¶¶ 44, 46, ECF No. 66.)  Lough testified that

the officers told Mr. Brown to get in the back of Cwynar's police cruiser, but he refused, stating,

"I'm not getting in."  (Def.'s SF ¶ 46, ECF No. 66.)  Eventually, Mr. Brown got into the police

cruiser on his own volition and was transported to the Shenango police station where he was held

until his son came to pick him up.   (Def.'s SF ¶ 46, Pl.'s SF ¶ 23, ECF No. 66.)

The NCPD Taser Handling Deployment Policy provides:

> The taser is an additional police tool. It's not intended to
> replace verbal problem-solving skills, self-defense techniques
> or firearm [sic]. The taser shall be deployed only in
> circumstances where it is deemed reasonably necessary to
> control a dangerous or violent subject. The taser shall be
> deployed when deadly force does not appear to be justified
> and/or necessary in attempts to subdue the subject where other
> conventional tactics have been or will likely be ineffective in a
> situation at-hand or there is a reasonable expectation that it will
> be unsafe for officers to approach within contact range of the
> subjective [sic].

(Pl.'s SF ¶ 26, ECF No. 66.)

On the same day, Cuscino filed a NCPD incident investigation report, stating in relevant

part:

> On 1/24/2007, this Officer responded to an Officer needs
> assistance call at Lawrence Village Plaza.  Upon arrival, this
> Officer found Trooper Phillips of the Pennsylvania State Police
> and Officer Cwynar of Shenango Township Police struggling with
> a white male in the front seat of a gold in color sedan.
>
> The male was refusing to exit the vehicle and still had the keys
> to the vehicle in his hand.  Trooper Phillips told the male to get out

of the vehicle on the passenger side where he was, and the male stated "no, I want to get out the other side." Officer Cwynar also advised that he had deployed a taser on the male three[8] times and he was still fighting him.

>With the arrival of other units, the male was removed from the vehicle and placed on the ground. The male continued to fight and was told if he did not quit resisting he would be tazed [sic]. The male continued to resist, and this Officer did deploy 1[-]5 second burst from my tazer [sic] in his left upper back. This was done with the drive stun technique. At this time the male did comply and was placed into custody by Officer Cwynar.

(Def.'s Concise Statement of Undisputed Material Facts, Ex. L, ECF 41-1 at 88.)

Lough filed a supplemental summary to Cuscino's incident investigation report, in which he stated in relevant part:

>On /1/24/2007, I responded to Shenango Police calling for help in the Lawrence Village Plaza. Upon my arrival other units from various agencies were already on scene or pulled up shortly after I did. PSP and Shenango PD Officer Cwyner [sic] were fighting with a white male inside a vehicle. The male was refusing to get out of the vehicle. Both Officers were on the passenger side of the vehicle, so I went to the drivers [sic] side of the vehicle. I pulled the male from the vehicle and stood him up by the vehicle. The male continued to struggle with numerous Officers and was then taken to the ground. While on the ground the male still continued to fight and had to be tazed. [Sic] At that point the male stopped struggling long enough to be placed in hand cuffs.
>Even after being cuffed, the male refused to fully cooperate. The male would not get in the cruiser, and had to be told numerous times to get in. Finally the male was given a choice to get in on his own or be shoved in. The male said to go ahead and shove him in, but then sat in the cruiser on his own.
>The male was then transported to Shenango's PD. Lawrence County Sheriffs [sic] Deputies assisted from there.

(Id.)

---

[8] Cwynar indicated that he tased Mr. Brown twice. See Cwynar Aff. of Probable Cause. (Def.'s Concise Statement of Undisputed Material Facts, Ex. M, ECF 41-1 at 92.)

The next day, January 25, 2007, Cwynar swore out a criminal complaint against Mr.

Brown charging him with resisting arrest and two counts of disorderly conduct stemming from

his action inside the Pearle store and his actions outside the store with the police officers. (Def.'s

SF ¶ 47, Pl.'s SF ¶ 24, ECF No. 66.) In the police criminal complaint Cwynar stated:

> PACC 5104 RESISTING ARREST OR OTHER LAW
> ENFORCEMENT (M2): That the said named defendant, Edward
> Brown, did with the intent of preventing a public servant from
> effecting a lawful arrest or discharging any other duty, did create a
> substantial risk of bodily injury to the public servant or anyone
> else, or employ means justifying or requiring substantial force to
> overcome the resistance. To wit: The defendant did physically
> fight with several police officers and refuse to comply with verbal
> commands that were given after being advised on several
> occasions that he was part of a criminal investigation causing the
> officers to use physical force and deploy the Taser on the
> defendant.
>
> PACC 5503(A)(1) DISORDERLY CONDUCT (M3): That the
> said named defendant, Edward Brown, with the intent to cause
> public inconvenience, annoyance or alarm or recklessly creating a
> risk thereof did engage in fighting or threatening, or in violent or
> tumultuous behavior. To wit: The defendant did physically fight
> with several police officers and refuse to comply with verbal
> commands that were given after being advised on several
> occasions that he was part of a criminal investigation causing the
> officers to use physical force and deploy the Taser on the
> defendant.
>
>
> PACC 5503(A)(4) DISORDERLY CONDUCT (M3): That the
> said named defendant, Edward Brown, with the intent to cause
> public inconvenience, annoyance or alarm or recklessly creating a
> risk thereof did create a hazardous or physically offensive
> condition by any act which serves no legitimate purpose of the
> actor. To wit: The defendant did cause a disturbance in Pearl [sic]
> Vision Center in Shenango Twp, Lawrence Co by threatening
> several employees of the store and threatening to spit in the face of
> employee, Linda Robinson after being told to leave by store
> personnel.

(Def.'s Concise Statement of Undisputed Material Facts, Ex. M, ECF 41-1 at 90.)

Cwynar also prepared an affidavit of probable cause in which he stated:

> On 1/24/07 at approx. 13:02 hrs. (1:02 P.M.) I, Officer Darrin Cwynar, was dispatched by L.E.O.C. to Pearl [sic] Vision for an irate customer inside the store causing a disturbance. I was in full uniform displaying a badge of authority and operating a fully marked police cruiser.

> On scene, a man was walking out of the store while I was walking in. The employees stated that the man who just walked out was the man causing the disturbance. He was walking to his car when I advised him that I would like to talk to him. He did not stop and continued to his vehicle. I again advised him that I needed to speak with him. He stopped and turned around and I asked him if he was just in Pearl [sic] Vision. He said that he was. I advised him that I was called because he was causing a disturbance in the store. He did not say anything. I asked him what happened in the store and he said "Would you buy a car if you didn't know the price?" I stated that I would not and asked again what happened inside the store. He then turned from me and opened his car door. I advised him that I wasn't finished speaking with him and had some more questions for him. He did not say anything and continued to open his car door. I asked if he had any identification on him and he said no. I asked if he had a drivers [sic] license and he said yes. I advised him that I needed to see it and he stated, "I don't have to show you anything". [sic] I advised that he was not free to leave and again to show me his identification. He then got into his car and started it.[9] I again gave verbal commands that I needed his identification and to shut off the vehicle. He stated that he did not have to listen to me and that he was leaving. I advised again to shut off the car and hand me the keys. He then reached for the transmission lever to leave. I grabbed his coat by the shoulder and continued to give verbal commands to shut off the vehicle and exit it. He did not comply and tried to grab the shifter again. I then tried to pull the man from the vehicle and he pulled away from me. I continued to give verbal commands during this. I advised him that if he did not comply, that he would be tased. He said that he was not getting out and he didn't have to listen to me. I then advised L.E.O.C to send another car for assistance. He then

---

[9] Cwynar stated – later in the affidavit of probable cause - that he believed Brown started his car by remote ignition. (Def.'s Concise Statement of Undisputed Material Facts, Ex. M, ECF 41-1 at 92.) Mr. Brown specifically denied that he ever started his car. See Edward D. Brown, Dep. 93, Sept. 29, 2009 (Def.'s Concise Statement of Undisputed Material Facts, ECF No. 41-1 at 10.) (Question by defense counsel: "Did you start the car at any time as you were walking towards it?" Answer by Mr. Brown: "No. I put the keys in the ignition.").

attempted to put the vehicle in reverse. Fearing that he was going to pull out with me partially in the vehicle, I pushed him across the front seat and began to struggle with him. I continued to give verbal commands to stop resisting and to give me the keys. The vehicle was still running per [sic] I believe he used a remote start for the vehicle. He continued to say that he would not do anything that I told him. I was on top of him at this point and pulled my Taser out and removed the cartridge. I again gave several verbal commands to stop resisting and to hand me the keys or he would be tased. He continued to say that he was not going to stop. I placed the taser on his tricep, without deploying, [sic] it and advised again to stop resisting and hand me the keys or he would be tased. He did not comply and was tased in his left tricep. After the cycle, I again advised to stop resisting or he would be tased again. I asked him to hand over the keys again and he would not. I then tried to reach for the keys in his right hand and he tried to kick me. I then deployed the Taser again on his tricep. I then continued verbal commands and waited for backup.

Trooper PHILLIPS was first on the scene. He approached from the passenger side and opened the door. He grabbed a hold of the actors [sic] hand and held onto him. Verbal commands were continuously given to get out of the vehicle in which the actor did not comply. I attempted to push him from his feet towards Trooper PHILLIPS to get him out of the vehicle. He then tried to kick me again. At that time other officers arrived on scene to assist. Lt. GRAMSKY, Officer CUSCINO and Officer LOUGH were on scene from the New Castle City Police. The actor said that he would finally get out of the car on his own. After he got out of the vehicle, Officer LOUGH told him to put his hands behind his back and the actor refused. The actor then pulled away and began resisting again. He was taken to the ground and I attempted to handcuff him while Officer LOUGH and CUSCINO assisted. Verbal commands to place his hands behind his back and stop resisting were continuously given in which the actor did not comply. He held his hands underneath himself as I struggled to try to handcuff him. He was advised that if he did not stop and comply, he would be tased again. He did not comply and Officer CUSCINO had to deploy his Taser on the actor. While he was being tased, I was able to handcuff the individual.

He refused to get into the back of my police cruiser after verbal commands to do so and continued to resist. He was eventually placed into the back of the cruiser.

Employee of Pearl [sic] Vision, Linda ROBINSON, stated that she was helping BROWN when he became irate. She said she couldn't understand why he was irate per [sic] she was doing everything she could to help him. He was upset about pricing on equipment and other matters. ROBINSON eventually told BROWN that he could take his business elsewhere per [sic] the disturbance he was causing. He got in ROBINSON'S face and told her that he will spit in her face. BROWN also told and [sic] employee in the Optometrist's office that "I guess I have to threaten everyone in her [sic] to get what I want." Employee, Erin CLINE also told the same story and said that BROWN was pacing around the store while yelling. The employees stated that they were in fear of BROWN and did not know what he was going to do.

The individual was identified as Edward BROWN by PA driver's license #08290022.

(Id. at 92-93.)

On March 1, 2007, a magisterial district judge in Lawrence County, Pennsylvania, held a preliminary hearing with respect to the charges filed against Mr. Brown, at which several witnesses offered testimony. (Id., Ex. B, at 18-38.) At the hearing, Pearle's employee, Robinson, testified:

COUNSEL FOR THE COMMONWEALTH: At what point in time? How long do you think? What kind of time passed by the time you heard these voices and started to observe what was happening?
. . .

ROBINSON: . . . At the point in time that I witnessed, I seen [sic] doctor – I'm sorry – Officer Cwynar standing outside the car and there was some shouting. And it seemed like all of a sudden, he had reached, I'm not quite sure. But you know. I saw some struggling going on. I saw Officer Cwynar was in the car and there was some struggling.
. . .

COUNSEL FOR THE COMMONWEALTH: Did you observe any struggle between Officer Cwynar and Mr. Brown?

ROBINSON: To a certain degree, yes.

COUNSEL FOR THE COMMONWEALTH:  <u>How were you
feeling about that at the time?</u>

ROBINSON:  <u>Well, I was shocked.  You, know.  I mean, you
know.  I was like, you know, what's happening, what's going on?</u>

. . .

COUNSEL FOR THE COMMONWEALTH:  Okay.  Did you
have any interaction with the officers including Officer Cwynar
after the situation was under control?

ROBINSON:  Yes.

COUNSEL FOR THE COMMONWEALTH:  What kind of
conversation did you have with them at that time?

ROBINSON:  Office Cwynar had come back in and, you know, he
more or less said, well, you know, what happened.  You know.
Again he had come back in to say what happened.  You know.
Apparently from my impression too that he was very surprised that
at the reaction and what had, you, know, what had happened
himself.

COUNSEL FOR THE COMMONWEALTH:  Did you explain it
again to him?

ROBINSON:  Yes.

COUNSEL FOR THE COMMONWEALTH:  What did you tell
him at that time?

ROBINSON:  Again, you know, we just more or less went over,
you, know.  I just myself, <u>I explained to him I couldn't understand
why Mr. Brown, you know, acted like he did and reacted like he
did.</u>

(Pl.'s SF ¶ 14; ECF No. 66; Def's Concise Statement of Undisputed Material Facts, Ex. B, ECF

41-1 at 25 (emphasis added).)

On March 27, 2008, Mr. Brown entered into the Lawrence County Alternative

Rehabilitative Disposition ("ARD") program in exchange for an expungement of the charges

from his record upon successfully completing the conditions of his ARD. (Def.'s SF ¶ 48, ECF No. 66.)

On November 20, 2009, plaintiffs' expert, Ronald F. Wethli ("Wethli"), a former Pennsylvania State police officer, in a report opined in relevant part:

> Based upon my experience as a Pennsylvania State Police Officer once Mr. Brown had been taken to the ground based upon my evaluating all of the statements he posed no legitimate threat to Officer Cuscino or anyone else. . . . Hitting the ground added to already having been tasered twice made Mr. Brown a non-threat. If as Officer Cuscino testified the only "real" reason that he had for tasering Mr. Brown was to get his cooperation, this is highly inappropriate under New Castle's Taser Guidelines.
> . . .
>
> It is my opinion within a reasonable degree of certainty that Officer Cuscino's conduct in tasering Mr. Brown was to punish him and not for any legitimate concerns. To punish an elderly individual who was face down on the ground by tasering him twice is inappropriate and is a gross abuse of power on the part of the policeman. Such behavior serves no legitimate law enforcement purpose. Such behavior in my experience is unnecessary and unwarranted and represents the use of excessive force. . . .

(Report of Pls.' Expert, Ronald F. Wethli, Nov. 20, 2009, ECF No. 34.)

## III.    Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .

**(c) Procedures.**

**(1)** *Supporting Factual Positions.*   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248; see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

19

taken as a whole could not lead a rational trier of fact to find for
the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most
favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts
in favor of the nonmoving party.  Cnty. of Centre, Pa., 242 F.3d at 446; Woodside v. Sch. Dist.
of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d
146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary
judgment stage.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir.
1998).

## IV.     Discussion

### A.      § 1983 Legal Framework

Mr. Brown asserts claims under 42 U.S.C. § 1983 which provides in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983.  "In order to recover under § 1983, a plaintiff must show that the defendant,
under color of state law, subjected the plaintiff to a deprivation of a right, privilege, or immunity

secured by the constitution or laws of the United States." <u>Renda v. King</u>, 347 F.3d 550, 557 (3d Cir. 2003) (citing 42 U.S.C. § 1983); <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d 261, 268 (3d Cir. 2000) ("Section 1983 is not a source of substantive rights . . . the plaintiff must allege a violation of a federal right.").

Plaintiffs argue that Cuscino used excessive force in violation of Mr Brown's Fourth Amendment rights. Cuscino responds that the evidence of record considered under the totality of the circumstances shows that he did not use excessive force as a matter of law, or in the alternative, he is entitled to qualified immunity. Plaintiffs dispute those arguments and raise three questions: 1) what are the relevant facts? 2) did Cuscino use excessive force? and 3) should the court consider the argument that entry into an ARD program precludes this case? In response to defendant's Motion, plaintiffs acknowledge that Mr. Brown's Fourth Amendment claim against Cuscino is based solely upon Cuscino's alleged use of excessive force on Mr. Brown. (Pls.' Br. in Opp. 1, 10, 13, ECF No. 45.) Plaintiffs agree the unlawful arrest claim was asserted only against Cwynar who was the arresting officer and they settled with Cwynar on all claims. Because Mr. Brown abandoned the unlawful arrest basis of his Fourth Amendment claim against Cuscino, the court need not discuss the issue raised in the third argument. Only the first and second issues will be addressed.

1.    <u>Relevant Facts</u>

Plaintiffs devote considerable attention to the relevant, vis-à-vis irrelevant, facts in this case. (Pls.' Br. in Opp. 3-13, ECF No. 45.) As noted above, the court will consider those facts which are supported in the record, and which plaintiffs do not deny on a factual basis, if they are helpful to the court in determining whether Cuscino's motion for summary judgment should be granted.

2.  <u>Excessive Force</u>

"'[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigation stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .'" <u>In re City of Phila. Litig.</u>, 49 F.3d 945, 962 (3d Cir. 1995) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).  Under the Fourth Amendment, citizens have the right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  The Fourth Amendment is made applicable to the states through the Fourteenth Amendment.  <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961).  An arrest violates the Fourth Amendment, however, if effected with an unreasonable use of force.  <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 240 (3d Cir. 2004) (citing <u>Graham</u>, 490 U.S. at 395; <u>Barna v. City of Perth Amboy</u>, 42 F.3d 809, 819 (3d Cir. 1994).

The elements of a Fourth Amendment excessive force claim are: 1) the occurrence of a seizure, which was 2) unreasonable under the circumstances.  <u>Lamont ex rel. Estate of Quick v. New Jersey</u>, No. 09-1845, 2011 WL 753856, at * 4 (3d Cir. 2011) (citing <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 599 (1989); <u>Graham</u>, 490 U.S. at 395-96; <u>Kopec v. Tate</u>, 361 F.3d 772, 776 (3d Cir. 2004) (finding that a claim for excessive force must involve a "seizure" that was unreasonable). "[A] suspect is not seized until he submits to the police's show of authority or the police subject him to some degree of physical force."  <u>Abraham v. Raso</u>, 183 F.3d 279, 291 (3d Cir. 1999).

In discussing the reasonableness standard under the Fourth Amendment, the United States Supreme Court has stated:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the

individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. *Id. [Tennessee v. Garner, 471 U.S. 1],* at 8, 105 S.Ct., at 1699, quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See *Terry v. Ohio,* 392 U.S. [1], at 22-27, 88 S. Ct., at 1880-1883. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See *Tennessee v. Garner,* 471 U.S., at 8-9, 105 S.Ct., at 1699-1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

Graham, 490 U.S. at 396 (1989)

"'Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Other factors to consider "include 'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006) (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)).

The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. The reasonableness finding should allow

for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly

evolving – about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation.

Id. at 397.  There is no "easy-to-apply legal test in the Fourth Amendment context" and "in the end we must still slosh our way through the factbound morass of 'reasonableness.'"  Scott v. Harris, 550 U.S. 372, 383 (2007).

Mr. Brown argues that Cuscino violated his rights under the Fourth Amendment because Cuscino allegedly used excessive force under the circumstance when he tased Mr. Brown.   To establish the existence of excessive force, Mr. Brown must show that a "seizure" occurred, and that the seizure was unreasonable.  Abraham, 183 F.3d at 288 (citing Brower, 489 U.S. at 599).  The court must apply an objective, "totality of the circumstances" analysis to determine whether the force Cuscino used to effect Mr. Brown's seizure was reasonable.  Abraham, 183 F.3d at 289.  The facts and circumstances faced by an officer at the moment of seizure, not the intention or motivation of the officer, determines the reasonableness of his or her use of force.  Id. (citing Graham, 490 U.S. at 396).  Reasonable, though mistaken, use of force justified by the circumstances as the officer observed them can also justify a particular use of force.  Bennett v. Murphy, 274 F.3d 133 (3d Cir. 2002).  A determination regarding reasonableness must allow for the practical reality that officers are frequently called upon to make split-second decisions, under tense, quickly changing circumstances.  Abraham, 183 F.3d at 289.  It is not always realistic to expect "detached reflection" by an officer before acting in a particular situation.  Id. (quoting Brown v. United States, 256 U.S. 335, 343 (1921)).

With respect to Mr. Brown's excessive force claim, Cuscino argues that the facts of record show that his use of the taser in the drive stun mode upon Mr. Brown's upper back was reasonable under the circumstances. Cuscino points to evidence that: 1) he had knowledge that Mr. Brown caused a disturbance in the Pearle store; 2) Mr. Brown resisted arrest prior to Cuscino's arrival on scene; 3) Cuscino personally observed Mr. Brown continuing to resist arrest after Cuscino arrived on scene; 4) Cuscino observed Mr. Brown kick Cwynar; 5) Cuscino believed that Mr. Brown posed a threat to himself and the other officers when Mr. Brown continually refused to release his hands despite repeated commands to do so; 6) Cuscino warned Mr. Brown multiple times that if he did not release his hands to be handcuffed, he would be tased; and 7) Cuscino's use of the taser had the intended appropriate effect that allowed the officers to cuff Mr. Brown under power.

In response to Cuscino's Motion, plaintiffs argue that a genuine issue of material fact exists with respect to whether Cuscino's use of the drive stun gun upon Mr. Brown rises to the level of excessive use of force under the circumstances. (Pls.' Br. in Opp. 1-16, ECF No. 45.) In support, plaintiffs point to several facts the court should construe in their favor, including: 1) Mr. Brown's age at the time, seventy-three years - coupled with the possibility that Cuscino "jumped the gun" by acting too quickly in using the stun-gun within a few seconds of arrival, causing pain and paralysis to Mr. Brown's muscles (Id. at 15); 2) plaintiffs' selective litigation of the officers involved in the incident, i.e., limited to Cuscino and Cwynar – who later settled (Id. at 2); 3) Mr. Brown was not under arrest when he was tased by Cuscino (Id. at 2, 5, 6, 11); 4) no exigency existed to stop or restrain Mr. Brown (Id. at 4-5); 5) Cuscino should have followed the lead of other officers by doing nothing (Id. at 6, 12); 6) the court should distinguish between the appropriate actions of an "arresting" officer" and an "assisting" officer (Id. at 10); 7) Cwynar testified that use of a taser is only appropriate in situations involving "fleeing suspects" (Id. at 6, 12); 8) Pearle's employee,

Robinson, was "shocked" by what she saw (Id. at 7, 10); and 9) plaintiffs' expert opined that Cuscino violated Mr. Brown's rights.

The problem with plaintiffs' arguments is three-fold. First, plaintiffs do not cite any legal authority to support their positions. Plaintiffs do not rely upon any case law to support their propositions the court should consider that they only sued two of the officers involved in the incident, Cwynar later settled with plaintiffs, Mr. Brown was not under arrest when he was tased by Cuscino, and a different standard applies for an officer who assists an arrest, as opposed to actually effecting an arrest. The litigation strategy, however, is not relevant, a settlement with other parties is not evidence in this context, and plaintiffs ignore the undisputed evidence that Mr. Brown was resisting arrest.

Second, plaintiffs do not point to evidence of record that accurately supports their factual positions. Plaintiffs did not adduce any evidence to show that: a) Mr. Brown's age affected his ability to commit the offense of disturbing the peace or resisting arrest, or b) no exigency existed for stopping and restraining Mr. Brown. The evidence is to the contrary. It took three officers to bring Mr. Brown under control while resisting arrest and Mr. Brown was kicking officers. The only reasonable conclusion is that Mr. Brown needed to be restrained.

Cwynar and Lough each testified that they did not believe they could let Mr. Brown go because his behavior was unpredictable. Plaintiffs' suggestion that Cwynar testified that the use of a taser is only appropriate in situations involving fleeing suspects is not supported by the record; rather, Cwynar testified that an appropriate use of a taser is to subdue a fleeing subject, "presumably in reference to firing the taser's projectile prongs at a suspect running away." (Pls.' S.F. ¶ 25, ECF No. 66.) Likewise, plaintiffs' characterization of Robinson's testimony as evidence

that she was shocked by the officers' conduct is not accurate. Robinson's statement is ambiguous at best and an overall reading of her testimony supports the reasonable conclusion that she was shocked by the events of the day caused by Mr. Brown. In any event, her testimony is about Cwynar's response to Mr. Brown, not Cuscino's response.

Third, plaintiffs' proposals with respect to how Cuscino should have addressed the situation, absent any support in the record, does not create a genuine issue of a material factual dispute. The opinion of Ronald F. Wethli ("Wethli"), plaintiffs' expert, (ECF No. 34), suggesting that Cuscino's actions violated Mr. Brown's civil rights, is not based upon factual support in the record. See Pa. Dental Ass'n. v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 262 (3d Cir. 1984) (finding that a factual predicate of an expert's opinion must find some support in the record). Among other things, Wethli states that: a) once Mr. Brown was on the ground, he posed no legitimate threat to Cuscino or anyone else, b) the only real reason Cuscino tased Mr. Brown was to get his cooperation, and c) and that Cuscino tased Mr. Brown twice while face down on the ground. These facts are inconsistent with the undisputed facts of record. It is undisputed that Mr. Brown continued to resist arrest even when he was face down, the taser was used to enable Mr. Brown to be handcuffed and Cuscino only tased Mr. Brown one time. Therefore, the undisputed evidence of record does not support the opinion of plaintiffs' expert.

The court finds that the undisputed evidence of record supports as a matter of law that the use of force was reasonable under the totality of the circumstances. The scene outside the Pearle store on the day in question was hectic. The testimony of Cwynar – which Mr. Brown does not directly dispute on a factual basis – shows that Mr. Brown resisted Cwynar's attempt to talk to him. Mr. Brown's response to Cuscino's statements of material facts is simply that those facts are not

necessary for the court to determine the Motion; he does not deny the description of the events leading up to Mr. Brown being tased by Cuscino.  Mr. Brown did not adduce any evidence that calls into question the totality of the circumstances testified to by Cuscino.  Mr. Brown does not dispute that: a) Cuscino received a call from LEOC that an officer needed backup, b) Cuscino observed Mr. Brown on the ground face down with both hands underneath him and he would not release his hands despite multiple commands, c) Mr. Brown continued to resist being handcuffed, d)  Cuscino felt threatened by Mr. Brown's actions, e) Cwynar and Lough attempted unsuccessfully to reach under Mr. Brown to grab his arms, f) after Cuscino applied a drive stun to Mr. Brown's left upper back, Mr. Brown released his hands and he was handcuffed, g) tasers can be used for "cuffing under power" and that when a subject has received a taser is the most opportune time to get them under control.  (Def.'s SF ¶ 45.)

Viewed in the light most favorable to plaintiff, no factual dispute presents a genuine issue of material fact regarding Cusino's use of force, i.e., the application of a drive stun taser, to subdue Mr. Brown sufficient to allow the other attending officers to place handcuffs on Mr. Brown  Mr. Brown was actively resisting even while he was face down on the ground.  He had continued to resist arrest even after being tased twice by another officer.  The other officers were struggling with Mr. Brown to place handcuffs on him and only after he was tased by Cuscino were the officers able to handcuff Mr. Brown.

Under the totality of the circumstances, no reasonable jury could return a verdict in favor of Mr. Brown on his excessive force claim against Cuscino.  See Revak v. Lieberum, 398 F. App'x 753, 756 (3d Cir. 2010) (holding that use of pepper spray upon arrestee was a reasonable response by police officers where arrestee was physically resisting arrest and verbally threatening officers);

Woods v. Grant, 381 F. App'x 144,146-47 (3d Cir. 2010) (holding that officer's use of force while executing search and arrest warrants was not excessive in violation of arrestee's Fourth Amendment rights, even though officers handcuffed arrestee and placed him face down on the ground, used conducted energy weapons, and subjected arrestee to attacks by police dog, where arrestee continually resisted arrest, was aggressive, combative, and would not respond to officers' commands even after repeated applications of the conducted energy weapons); Smith v. Addy, 343 F. App'x 806, 808-09 (3d Cir. 2009) (officer's use of force during traffic stop, which included spraying motorist with pepper spray and striking motorist in the leg, was reasonable, where motorist exited vehicle and assumed fighting stance, physically resisted placing his hands on his vehicle as instructed by officer, kicked officer in chest, ran away, and resisted officer's order to the ground); but see Gulley v. Elizabeth City Pol. Dept., 340 F. App'x 108, 110 (3d Cir. 2009) (police officers' beating suspect on face and head, who was lying down and not resisting arrest, would constitute excessive force in violation of Fourth Amendment).

### b. Qualified Immunity

In the alternative, Cuscino argues that, even if he may be found liable for an alleged used of excessive force, qualified immunity would relieve him of that liability, because reasonable officers would have believed his conduct was lawful in light of clearly established law and the information he possessed at the time of the incident. Qualified immunity is an entitlement not to stand trial or face other burdens of litigation and is an immunity from suit rather than a mere defense to liability. Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009) (finding that qualified immunity can relieve an individual of liability for mistakes of law, mistakes of fact, and mistakes relating to mixed questions of law and fact); Saucier v. Katz, 533 U.S. 194, 200-01 (2001).

Claims of qualified immunity are evaluated using a two-step process. Bennett, 274 F.3d at 136. In order to conclude that an individual has qualified immunity, the court considers whether the facts as alleged by a plaintiff establish a constitutional right and whether the right at issue was "clearly established" at the time of the alleged misconduct. Pearson, 129 S. Ct. at 816-18. Because Cuscino asserts that he is entitled to qualified immunity, "[Mr. Brown] plaintiff bears the initial burden of showing that [Cuscino's] conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).

First, the court must determine whether the facts, taken in the light most favorable to Mr. Brown, show a constitutional violation by the Cuscino. Bennett, 274 F.3d at 136. If no such violation is established, then the inquiry ends and the officer is entitled to qualified immunity. Id. In other words, if it can first be determined that there was no "clearly established" right, the analysis need go no further, and a finding of qualified immunity is warranted. Pearson, 129 S. Ct. at 816-18. A finding of immunity, however, would be improper if there are "'unresolved disputes of historical fact relevant to the immunity analysis.'" Wright, 409 F.3d at 599 (quoting Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002)). All the factual allegations must be viewed in the light most favorable to Mr. Brown. Wright, 409 F.3d at 600. The "dispute does not turn upon 'which facts the parties might be able to prove, but rather, whether or not certain given facts, showed a violation of 'clearly established' law.'" Id. at 599 (quoting Johnson v. Jones, 515 U.S. 304, 311 (1995)).

A "clearly established" statutory or constitutional right is one which a reasonable person would have known. Gruenke v. Seip, 225 F.3d 290, 298-99 (3d Cir. 2000). A reasonably competent public official should be aware of the laws governing his or her conduct, and will not enjoy qualified immunity unless extraordinary circumstances existed, or it can be shown that the

public official neither knew nor should have known about a particular legal right. Id. (citing

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Reasonableness" in this instance is an objective

standard. Id. (citing Anderson, 483 U.S. at 639). It is a fact-intensive inquiry, requiring:

> "The contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing violates
> that right. This is not to say that an official action is protected by
> qualified immunity unless the very action in question has been
> previously held unlawful, but it is to say that in the light of pre-
> existing law the unlawfulness must be apparent."

Id. at 299 (quoting Anderson, 483 U.S. at 639). "[T]he question is whether a reasonable public

official would know that his or her *specific conduct* violated clearly established rights." Id. at 299-

300 (quoting Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996) (citing Brown v.

Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990)). "'[A]ll but the plainly incompetent or those who

knowingly violate the law' are protected by qualified immunity." Id. (quoting Malley v. Briggs,

475 U.S. 335, 341 (1986)); see Hunter v. Bryant, 502 U.S. 224, 229 (1991); Gilles v. Davis, 427

F.3d 197, 203 (3d Cir. 2005).

Here, the accounts of several witnesses corroborate the events preceding Cuscino's tasing

of Mr. Brown, and the degree of force actually utilized by Cuscino. Plaintiff did not factually

dispute those accounts. As such, viewing the facts in the light most favorable to the plaintiff, the

court finds that, as a matter of law, a reasonable officer would not have known he was using

excessive force under the circumstances.

Cuscino correctly argues that even if Mr. Brown had established an issue of material fact

regarding excessive force, Cuscino would be entitled to qualified immunity. Summary judgment

for an officer who claims qualified immunity is appropriate where "'after resolving all factual

disputes in favor of the plaintiff, [ ] the officer's use of force was objectively reasonable under the circumstances'" Gilles, 427 F.3d at 207 (quoting Kopec, 361 F.3d at 777). Because Mr. Brown failed to show that Cuscino's use of the drive-gun taser was an excessive use of force under the circumstances, he cannot establish a constitutional violation by Cuscino. Under those circumstances, Cuscino is entitled to qualified immunity and is immune from suit. Bennett, 274 F.3d at 136.

### B.    State Claims

The counts contained in plaintiffs' amended complaint against Cuscino under counts VII and VIII arise under Pennsylvania law. (Am. Compl., ECF No. 14.) The court will dismiss all claims over which it has original jurisdiction, and will decline to exercise supplemental jurisdiction over plaintiff's Pennsylvania law causes of action pursuant to 28 U.S.C. § 1367(c)(3). The court expresses no opinion with respect to whether the state law claims contained in count VII for assault and battery or in count VIII for loss of consortium would survive a motion for summary judgment. It suffices to note that plaintiffs' remaining claims allege no violation of the United States Constitution or federal law and that summary judgment must be granted in favor of defendant on all plaintiffs' claims under 42 U.S.C. § 1983.

## V.    Conclusion

After reviewing the undisputed material facts of record, viewing the disputed facts of record in favor of plaintiffs, and drawing all reasonable inferences in plaintiffs' favor, for the reasons set forth above, the court determines that plaintiffs did not establish any genuine issues of material fact with respect to the federal claim asserted against defendant and defendant is

entitled to judgment as a matter of law on that claim.  Therefore, summary judgment must be granted in favor of defendant with respect to count VI.

The court will decline to exercise supplemental jurisdiction over plaintiffs' Pennsylvania law causes of action in counts VII and VIII of the Amended Complaint pursuant to 28 U.S.C. § 1367(c)(3).  An appropriate order will be entered.


Date:  March 21, 2011                                    By the court:

                                                         /s/ JOY FLOWERS CONTI
                                                         Joy Flowers Conti
                                                         United States District Judge